GERBER PRODUCTS COMPANY v ANDERSON, CLAYTON & COMPANY

1. MANDAMUS—COURTS—VENUE—STATUTES.

A mandamus action against a state official may be brought, at the plaintiff's option, in the Court of Appeals, the Circuit Court for the County of Ingham, or any other circuit court of proper venue (MCLA 600.4401; MSA 27A.4401).

2. APPEAL AND ERROR—SUPERINTENDING CONTROL—SPEEDY REMEDY.

A complaint for an order of superintending control against the Director of the Corporation and Securities Bureau is appropriate where due to basic securities economics and the possibility of market manipulation time is of the essence, and an appeal would not be a speedy remedy under the circumstances.

3. SECURITIES REGULATION—MATERIAL INFORMATION—AVERAGE PRUDENT INVESTOR.

Material information in a registration statement required by securities laws is anything of which an average prudent investor ought to be informed before deciding whether to buy, sell or hold an affected security; a fact is material per se if a reasonable investor would consider that particular item of information important in making an investment decision.

4. TAXATION—RETIREMENT INVESTMENT PLAN—TAX CONSEQUENCES—DISTRIBUTION OF BENEFITS—STATUTES.

A retirement investment plan, whether deemed a pension plan, deferred compensation plan, employee stock option plan, or other retirement benefit plan, is exempt from taxation; there

REFERENCES FOR POINTS IN HEADNOTES

[1] 52 Am Jur 2d, Mandamus § 381.
Venue of actions or proceedings against public officers. 43 ALR2d 423.
[2] 69 Am Jur 2d, Securities Regulation—State § 94 et seq.
[3] 69 Am Jur 2d, Securities Regulation—State § 47 et seq.
[4] 71 Am Jur 2d, State and Local Taxation § 507 et seq.
[5] 69 Am Jur 2d, Securities Regulation—Federal § 146.
[6–10] 69 Am Jur 2d, Securities Regulation—Federal § 272 et seq.

will be no tax consequences to the employees until such time as there is a distribution of the funds through payments of retirement benefits (26 USCA 401, 402[a]).

5. SECURITIES REGULATION—REGISTRATION STATEMENT—TENDER OFFER—MINORITY INTEREST.

A registration statement by a party making a tender offer to the shareholders of a corporation which the party seeks to take over need not specify that if the retirement investment plan of the employees of the target corporation retains all or part of its shares in the target corporation the value of those shares may be affected by a successful take-over by the offeror, and that the shares held by the retirement investment plan will constitute a minority interest.

6. SECURITIES REGULATION—REGISTRATION STATEMENT—TENDER OFFER—MISLEADING INFORMATION—ANTITRUST VIOLATIONS—FEDERAL TRADE COMMISSION.

Inclusion of a statement accompanying a tender offer to a target company's shareholders that the offeror had been advised by special counsel that no antitrust violation would be involved in the take-over, if it were successful, was misleading where the opinion of counsel seems dubious in light of precedent regarding a major company's take-over of another major company in a related industry, and where subsequent to the rendering of the opinion by counsel an investigation of the proposed take-over was undertaken by the Federal Trade Commission.

7. SECURITIES REGULATION—TENDER OFFER—REGISTRATION STATEMENT—SECURITIES EXCHANGE COMMISSION.

It was unreasonable for a tender offeror to omit from its registration statement filed with the Corporation and Securities Bureau information concerning admissions made to the Securities Exchange Commission in regard to the alleged payment of inducements to foreign officials, except to admit that it has been alleged that such payments have been made and denying each of the material allegations thereby placing the burden of discovery on the individual tender offeree, where full information could have been disclosed in the body of the required registration statement.

8. SECURITIES REGULATION—TENDER OFFER—MANIPULATIVE PRACTICES—FIRST AMENDMENT—NEWS MEDIA—STATUTES.

A statute which prohibits a tender offeror from engaging in manipulative acts or practices in connection with a tender offer should not be construed to limit the first amendment right of

an offeror to reveal its plans to the news media (MCLA 451.910[2]; MSA 21.293[10][2]).

9. Securities Regulation—Tender Offer—Effective Date—Purchase of Shares—Statutes.

   The statute dealing with tender offers prohibits the offeror from purchasing any shares of the target company for 60 days *after* the effective date of a tender offer, and makes no mention of purchasing shares *prior* to the effective date of a take-over offer; the purchase of shares on the open market does not constitute a tender offer for purposes of regulatory legislation (MCLA 451.905; MSA 21.293[5]).

10. Securities Regulation—Tender Offer—Corporation and Securities Bureau—Hearing—Statutes.

   The Director of the Corporation and Securities Bureau is required to hold a hearing with respect to a tender offer only where there are substantial grounds for believing that a prima facie case establishing a violation of the Michigan securities act can be made (MCLA 451.905[4]; MSA 21.293[5][4]).

Appeal from Newaygo, Harold Van Domelen, J. Submitted May 26, 1977, at Lansing. (Docket No. 77-1857.) Decided June 10, 1977.

Complaint by Gerber Products Company against Anderson, Clayton & Company and the Director, Corporation and Securities Bureau, Michigan Department of Commerce for an order of superintending control ordering the Director to hold a hearing on alleged violation by Anderson, Clayton of the act regulating take-over offers and for injunctive relief. Order for superintending control denied and injunctive relief denied. Plaintiff appeals. Remanded for further proceedings.

*Warner, Norcross & Judd* (by *William K. Holmes, Ernest M. Sharpe,* and *Eugene E. Smary),* for plaintiff.

*Varnum, Riddering, Wierengo & Christenson* (by *Jon F. Dewitt* and *Dennis C. Kolenda)* and *Miller,*

*Canfield, Paddock and Stone* (by *Richard B. Gushee* and *Wolfgang Hoppe*) (*Davis, Polk & Wardwell,* by *Richard E. Nolan,* of counsel), for defendant Anderson, Clayton & Company.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Harry G. Iwasko, Jr.,* and *Marc A. Goldman,* Assistants Attorney General, for Director, Corporation and Securities Bureau.

Before: R. B. BURNS, P. J., and ALLEN and D. E. HOLBROOK, JR., JJ.

PER CURIAM. This is an appeal of right from a judgment of the Newaygo County Circuit Court, made final pursuant to GCR 1963, 518.2, dismissing Count I of plaintiff's complaint, a petition for superintending control, for lack of jurisdiction.

This litigation arises out of a take-over offer made by Anderson, Clayton & Co. As delay in decision would work to the detriment of Anderson, Clayton, and in light of the fact plaintiff has filed a motion to expedite the appeal, we peremptorily remand this cause, pursuant to GCR 1963, 820.1(5), (7) for further proceedings consistent with this opinion.

Regarding the jurisdictional issues, in holding that it lacked authority to issue mandamus to the Director, Corporation and Securities Bureau, Department of Commerce, a state official, the circuit court seems to have overlooked recently enacted 1976 PA 317; MCLA 600.4401; MSA 27A.4401, amending RJA § 4401 to provide that mandamus may be brought, at the plaintiff's option, in this Court, the Circuit Court for the County of Ingham, or any other circuit court of proper venue. Furthermore, the circuit court had jurisdiction to

issue an order of superintending control. GCR 1963, 711.4; *Chrysler Corp v Civil Rights Commission,* 68 Mich App 283; 242 NW2d 556 (1976), *Radke v Employment Security Commission,* 37 Mich App 104; 194 NW2d 395 (1971). The question of whether to issue the writ is distinct from the power to do so. Here, issuance would depend on whether the Director abused his quasi-judicial discretion either by denying Gerber's request for hearing or by accepting Anderson, Clayton's registration statement as being in compliance with MCLA 451.908; MSA 21.293(8). Due to basic securities economics and the omnipresent possibility of market manipulation during any period of uncertainty following public disclosure of the existence of a take-over offer, time is of the essence and appeal is not a "speedy" remedy under the circumstances. In lieu thereof, superintending control may therefore be sought. *Cf.* GCR 1963, 711.2; *Oakland County Prosecutor v 46th District Judge,* 72 Mich App 564, 566–567; 250 NW2d 127 (1976).

In enacting 1976 PA 179; MCLA 451.901–451.917; MSA 21.293(1)–21.293(17), the Legislature intended to insure that affected securities investors could make informed decisions regarding management changes accomplished through the medium of take-over offers, thereby buttressing public confidence in securities as a medium of investment, HR Rep No 1711, 90th Cong, 2d Sess; *reprinted in* (1968) US Code Cong & Ad News, 2811, and to emphasize to the investor the potential effect of his decision on the Michigan economy, as evidenced by MCLA 451.908(1)(c), (h); MSA 21.293(8)(1)(c), (h). Accordingly, the statutory requirement that the offeror provide "material" information must be construed in this light. *Moore v Department of Military Affairs,* 398 Mich 324, 327; 247 NW2d 801 (1976).

"Material" information is anything of which an average prudent investor ought reasonably to be informed before deciding whether to buy, sell or hold an affected security. 17 CFR 230, 204(1) (1971), applied in *Gilbert v Nixon,* 429 F2d 348, 356 (CA 10, 1970), and *Johns Hopkins University v Hutton,* 422 F2d 1124, 1128–1129 (CA 4, 1970). If a reasonable investor would consider a particular item of information important in making such a decision, that fact is "material" per se. *Affiliated Ute Citizens of Utah v United States,* 406 US 128, 153–154; 92 S Ct 1456; 31 L Ed 2d 741 (1972).

Gerber makes 11 allegations of omission of "material" information and error on the part of the Director of the Corporation and Securities Bureau of the Michigan Department of Commerce who is the administrator of take-over and tender offer matters. The first allegation of a material omission in the registration statement is the failure to disclose Anderson, Clayton's plans with regard to changing the number of employees in this state, as required by § 8(1)(c) of 1976 PA 179; MCLA 451.908(1)(c); MSA 21.293(8)(1)(c). Gerber notes that the registration statement asserts Anderson, Clayton has no "present" intention of "significantly" reducing "production facilities", but makes no specific mention of plans regarding the 650 nonproduction workers employed by Gerber. Aside from the production workers, the remaining Gerber workers perform functions which are in large part duplicated in Anderson, Clayton's Houston-Dallas facilities.

The answer to this allegation is that it is untrue. The registration statement, part VII D states:

"Except as stated in such information, there are no plans or proposals or negotiations, which the offeror has

to liquidate Gerber Products Company, sell its assets, effect its merger or consolidation, change the number of its employees in Michigan or change the terms and conditions of their employment, or make any other substantial change in its business, corporate structure, management, or employees upon gaining control."

Second, Gerber contends that the proposed takeover will affect the terms and conditions of employment of Gerber employees by affecting their pension plan value and retirement benefits, and third, that the disclosure statements do not contain a discussion of the adverse tax consequences which will befall Gerber workers.

In light of the present state of the Federal tax law, these allegations lack apparent merit. Gerber notes that as of December 31, 1975, 2,007 Gerber employees were participants in the retirement investment plan, which by its own terms is required to invest in Gerber stock and holds some 414,000 shares. However, the retirement investment plan, whether deemed a pension plan, deferred compensation plan, employee stock option plan, or other retirement benefit plan, is exempt from taxation. 26 USCA 401 (IRC 1954); Treasury Regs 1.401-1. Should the retirement investment plan sell some of its 414,000 shares to tender offeror it will pay no taxes on the gain because it is tax exempt, and there will be no tax consequences on the employees until such time as there is a distribution of the funds through payments of retirement benefits. 26 USCA 402(a) (IRC 1954); Treasury Reg 1.402(a)-1. The fact that, in order to take advantage of the highly favorable tender offer, the retirement investment plan may need to be amended so as to allow investments in things other than shares of Gerber corporation is a minor detail, easily effectuated without adverse tax con-

sequences. Furthermore, any employee can transfer within certain time limits rights from one pension fund to another qualified pension fund without any tax consequences. As Anderson, Clayton has specifically announced in its disclosure statements that it intends to effect no change in the existing retirement plan, Gerber's allegations are seen to be invalid both factually and legally.

Fourth, Gerber contends that the disclosure statement should specify that if the retirement investment plan retains its 414,000 shares of Gerber, or some of them, the value of these shares will be affected by the fact that the company is controlled by Anderson, Clayton, and that such shares therefore constitute a minority interest which may be of diminished value. No reason to make such disclosure appears where such is the effect of any take-over in any company. Disclosure statements are designed to inform the existing stockholders of the kind of new management control he can expect in his company so he can determine whether or not to retain his shares, contribute to the take-over by accepting the tender, or sell his shares on the open market and, in effect, abstain from the decision. Nothing in the philosophy of disclosure requires that investors be given lessons in the basic rules of the investment game concerning majority and minority shareholding. Moreover, Anderson, Clayton has specifically acknowledged in several of the exhibits which are letters to the defendant administrator that it regards itself as a fiduciary with respect to the minority shareholders and is prepared to be held accountable for its subsequent actions should the take-over succeed.

Fifth, Gerber contends that the disclosure statement is misleading in discussing antitrust implications. The disclosure statement notes that in any

such acquisition, by a company as large as Anderson, Clayton of a company the size of Gerber, there are always unpredictable antitrust consequences, and the acquisition might well be blocked by Federal officials through legal action. However, the disclosure statement notes that Anderson, Clayton's special counsel has advised it that no antitrust violation is involved. Gerber's answer to this is that the Federal Trade Commission has begun an investigation of the proposed take-over and that this should be disclosed in the take-over registration statement. Gerber relies on *Hill York Corp v American International Franchises, Inc,* 448 F2d 680 (CA 5, 1971).

The *Hill York* case is totally inapposite to the present case. That involved a pyramid scheme, and the Court found numerous misleading and material omissions where purchasers were given a brochure representing that the defendant promoters of the franchise operation had just left a very successful firm without disclosing the fact that the firm was under investigation by the FTC. Other misleading statements involved included a claim that one of the defendant promoters was an expert in capitalization consulting, when he had no experience in this field. The brochure claimed that the franchise fee was $25,000 when in actuality it was $25,000 plus $1,000 per month royalty. Finally, the brochure claimed that existing sales centers were operating successfully, but it failed to disclose that most of such centers were under investigation by various state securities commissions.

Sixth, Gerber does have a solid point when it notes that allowing the opinion of special counsel to be circulated in this fashion is misleading because the opinion was rendered prior to the commencement of the FTC investigation. Furthermore, the opinion seems dubious in light of exist-

ing precedent. Since a major food processor such as Anderson, Clayton[1] is always a threat to enter related food markets, its acquisition of the dominant company in the baby food market[2] might well run afoul of § 7 of the Clayton Act, 15 USCA § 18. *Federal Trade Commission v Procter & Gamble Co,* 386 US 568; 87 S Ct 1224; 18 L Ed 2d 303 (1967).

The importance of clearly and fully disclosing in the registration statement the existence of the FTC investigation and of attenuating the force of the special counsel's opinion can be seen by considering the investor's decision whether to accept the tender offer or to retain some of his shares should the tender be accepted as to only part of his holdings. If the acquisition later results in an FTC decision to compel divestiture under the Clayton Act, the market would be flooded with Gerber shares which Anderson, Clayton would have to dispose of. This would grossly depress the stock price of Gerber and consequently reduce the liquidity and value of the holdings of all other investors owning Gerber stock. Faced with that grim possibility, many investors might well decide not to tender their shares.

Seven, Gerber alleges that the disclosure statement makes no mention of Anderson, Clayton's admissions to the SEC in Form 8-K filed May, 1976, and February, 1977, admitting payment of "inducements" to foreign officials in order to assist Anderson, Clayton operations in other countries. Instead, the disclosure statement acknowledges only that it is alleged that such payments have been made and denies each of the material allegations. Anderson, Clayton defended this omission by

[1] Anderson, Clayton controls nationally, 11% of the pourable salad dressing market, 7% of the butter substitute market, *inter alia.*

[2] Gerber controls 69% of the national baby food market.

noting that copies of Form 8-K are available from the SEC or from the Department of Commerce, but placing such a burden of discovery on the investor seems unreasonable when it could be disclosed in the body of the required registration statement. Thus, we find merit in Gerber's allegation on this issue.

Eight, the next allegation by Gerber is that Anderson, Clayton has failed to properly disclose the source and amount of funds to be used in acquiring the Gerber stock, a requirement of § 8(1)(b) of 1976 PA 179; MCLA 451.908(1)(b); MSA 21.293(8)(1)(b). This allegation is without factual support. In the file are loan commitment papers in the amount of 210 million dollars from Morgan Guarantee Trust Company and Manufacturers Hanover Bank, two of the largest financial institutions in the country. Gerber contends that Anderson, Clayton has not established its ability to pay back the loans, but this argument seems weak in light of Anderson, Clayton's observation that institutions such as Morgan Guarantee Trust do not loan out hundreds of millions of dollars without being assured that repayment will be forthcoming.

Nine, Gerber contends that, through carefully placed press releases, Anderson, Clayton has violated § 10(2) of 1976 PA 179 by engaging in "manipulative act[s] or practice[s] in connection with a tender offer", MCLA 451.910(2); MSA 21.293(10)(2). Gerber gives no explanation as to why the act should be construed to limit the first amendment right of an offeror to reveal its plans to the news media. The only thing manipulative about Anderson, Clayton's actions in this regard is that the $40 per share offer is so tempting it may well create a stampede, something Gerber management understandably finds threatening to its continued employment security.

Ten, it is argued that Anderson, Clayton, by purchasing 90,000 shares of Gerber stock within 60 days of the tendering period, violated § 5 of 1976 PA 179; MCLA 451.905; MSA 21.293(5). However, § 5 merely prohibits the purchase of any shares for 60 days *after* the effective date of a tender offer. Nowhere in the act is there any mention of purchasing shares *prior* to the effective date of a take-over offer. Furthermore, every court which has previously considered the issue has held that purchase of shares on the open market does not constitute a "tender offer" for purposes of regulatory legislation. *Gulf & Western Industries, Inc v Great Atlantic & Pacific Tea Co, Inc,* 356 F Supp 1066 (SD NY, 1973), *aff'd* (without mentioning this point), 476 F2d 687 (CA 2, 1973), *Water & Wall Associates, Inc v American Consumer Industries, Inc,* 1973 CCH Fed Sec L Rep ¶ 93, 943 (DC NJ, 1973), *D-Z Investment Co v Holloway,* 1974–5 CCH Fed Sec L Rep ¶ 94, 771 (SD NY, 1974), *Nachman Corp v Halfred, Inc,* 1973–4 CCH Fed Sec L Rep ¶ 94, 455 (ND Ill, 1973). 1976 PA 179 accords recognition to this principle by exempting from the definition of "take-over offer" in § 4(2)(c) the acquisition of an equity security "pursuant to an offer effected by or through a broker-dealer in the ordinary course of his business", MCLA 451.904(2)(c); MSA 21.293(4)(2)(c).

Eleven, last is the question of the propriety of the Director's decision not to grant Gerber a hearing. As the Director noted in letters to counsel for Gerber, as originally introduced, 1975 House Bill No. 4151 would have required the Director to order a hearing upon request of the target company:

"Unless prior thereto the administrator calls a hear-

ing with respect to the offer. The administrator may call a hearing if necessary or appropriate for the protection of offerees in this state, and shall call a hearing if requested by the target company."

As enacted, however, § 5(4) provides simply that the effective date of a take-over offer may be stayed by the Director "if the administrator orders a hearing for * * * [the] alleged violation of this act", MCLA 451.905(4); MSA 21.293(5)(4). Given the exigencies of securities trading, the statute should be construed as requiring a hearing only where there are substantial grounds for believing that a prima facie case establishing a violation of the act can be made.

Gerber seeks a hearing for the purpose of examining under oath executives of Anderson, Clayton regarding the truth of statements in the registration statement now pending. We agree with the Director that he need not hold such hearing. If the registration statement discloses all material facts as required by the act, the averments therein may be accepted by the Director as true. Should subsequent events establish the falsity of any statement in the registration statement, the act provides ample remedies by way of rescission of any sale or purchase on petition of the Director, Attorney General, or prosecuting attorney of the appropriate county. MCLA 451.914(2); MSA 21.293(14)(2). Investors are protected by being able to file an action to recover the security, plus any income received thereon by the purchaser together with interest, costs, and reasonable attorney's fees. MCLA 451.917(1); MSA 21.293(17)(1). The potential imposition of such draconian penalties provides sufficient assurance of the truth of statements made in the registration statement for the purpose of allowing a take-over effort to proceed.

In conclusion, we hold that the trial court did have jurisdiction to issue a writ of superintending control. We further find against Gerber on 9 of the 11 charges of material omission in the registration filed by defendant and approved by the Director. Nevertheless, we conclude that in two respects the registration statement requires fuller disclosure. This cause is therefore remanded to the Newaygo County Circuit Court, with instructions to supervise the supplementation of the registration statement so as to provide full, fair, and truthful disclosure of possible antitrust consequences and of past "payments" to foreign officials as disclosed in previously filed Forms 8-K promulgated by the SEC. The restraining order entered by the circuit court on May 20, 1977, shall be continued until the circuit court and the Director are satisfied that the registration statement truthfully, fairly and fully discloses all material matters.

Pursuant to GCR 1963, 821.3 the clerk is hereby ordered to issue final process in this cause forthwith. No costs, neither party having prevailed in full.